The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
July 11, 2019

## 2019COA105

**No. 16CA1059, *People v. Flynn* — Constitutional Law — Sixth
Amendment — Right to Counsel; Criminal Law — Counsel of
Choice**

In this case, a division of the court of appeals further explores

the trial court's obligations when addressing a criminal defendant's

request for a continuance in order to retain counsel of choice.  The

division concludes that where the defendant had identified the

attorney he wished to speak to about representation, but no steps

had been taken to retain that attorney, the trial court was not

required to consider the eleven factors set forth in *People v. Brown*,

2014 CO 25.  Instead, the division concludes that the facts of this

case fall closer to *People v. Travis*, 2019 CO 15, in which the

supreme court did not require explicit findings on any specific

factors.  Because the facts were more similar to those in *Travis*, the

division determines that the trial court did not abuse its discretion in denying the continuance, and therefore affirms the trial court.

The division also declines to disturb the convictions based on allegations that the prosecution suppressed evidence in violation of *Brady* and that comments made by the trial court during voir dire lowered the burden of proof and therefore implicated the defendant's constitutional rights. Nevertheless, regarding the trial court's voir dire comments, the division reiterates the concern that such extended discussion of the core legal principles, going beyond the scope of the standard definition in the model jury instructions, provides little in the way of additional clarity, and runs the risk of creating structural error.

Court of Appeals No. 16CA1059
Adams County District Court No. 15CR1862
Honorable Francis C. Wasserman, Judge
Honorable Thomas R. Ensor, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Thomas T. Flynn,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE TOW
Richman and Rothenberg*, JJ., concur

Announced July 11, 2019

Philip J. Weiser, Attorney General, Carmen Moraleda, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Meredith E. Osborne, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2018.

¶ 1    Defendant, Thomas T. Flynn, appeals his judgment of conviction entered on jury verdicts finding him guilty of menacing, vehicular eluding, reckless endangerment, failure to stop at a red light, and speeding. We affirm.

## I.    Background

¶ 2    In 2015, William Garibay was driving home from work when he noticed a Cadillac driving in front of him in the left lane. When Garibay's car approached the Cadillac, the driver of the Cadillac stepped on his brakes, causing Garibay to brake abruptly. The Cadillac then moved into the right lane, and its driver started yelling profanities at Garibay. The driver held a pistol across his chest and pointed it at Garibay. Garibay called 911, provided the dispatcher with the Cadillac's temporary license plate number, and attempted to follow the vehicle until he lost sight of it.

¶ 3    Garibay met with a responding police officer and provided a physical description of the driver, indicating he would be able to recognize the driver. In the meantime, a police officer located the Cadillac and gave chase, but the Cadillac driver eluded the officer. During the investigation, police determined that the temporary tag was associated not with a Cadillac, but rather with an older model

1

Buick sedan registered to Flynn's father. Garibay then identified Flynn in a photographic array as the driver of the Cadillac. The police never located the Cadillac or the gun. A jury found Flynn guilty of menacing, vehicular eluding, reckless endangerment, failure to stop at a red light, and speeding. Flynn now appeals the convictions.

## II. Analysis

¶ 4 Flynn contends that a new trial is required because the trial court erred by (1) denying his motion to continue; (2) determining that no due process violation resulted from the prosecution's failure to disclose certain evidence; and (3) giving instructions to the jury that lowered the prosecution's burden of proof. We address and reject each contention in turn.

## A. Motion to Continue

¶ 5 Flynn first argues that the trial court erred in denying his motion to continue his trial. Because he sought a continuance to obtain substitute defense counsel, Flynn argues that the trial court's denial of his motion violated his Sixth Amendment rights. We disagree.

## 1.     Additional Facts

¶ 6     At the pretrial conference, one week before trial, Flynn's court-appointed attorney requested a continuance of trial, noting Flynn's request to substitute counsel:

> MS. LANZEN:  The other thing that Mr. Flynn had noted to me is that it's his intent to hire counsel of his choice.  He has been working and saving money to get a retainer to hire an attorney.  It was his hope that he would have that attorney today.  However, he needed a little more time.  He said he was going to go over to Harvey Steinberg's office afterwards to see if he can set up the retainer.
>          We would ask the Court to vacate the jury trial.

¶ 7     The trial court denied this motion, in part because the request was "very last minute" and there was "no indication that there's other counsel who is actually going to enter his or her appearance in this matter."  The court described the motion as a tactic to delay trial.

¶ 8     On the first day of trial, defense counsel renewed her request for a continuance, again noting that Flynn wanted to hire a private attorney for trial:

> MS. LANZEN:  He originally hired an attorney.  That attorney had to withdraw.  My office was appointed.  And then after some limited

contact with Mr. Flynn, he had made the decision to hire an attorney. He just didn't have the money. . . .

He said he had contacted Howard – Harvey Steinberg and wanted to retain him to represent him at the trial and so wanted me to ask the Court to continue this so that he could have the attorney of his choice.

¶ 9　　The court again denied the request. The court noted that "[h]ad another attorney entered or even been present today, I might have considered [a continuance]."

## 2.　Standard of Review

¶ 10　　"A motion for a continuance falls within 'the sound discretion of the trial court.'" *People v. Brown*, 2014 CO 25, ¶ 19 (quoting *People v. Hampton*, 758 P.2d 1344, 1353 (Colo. 1988)). Thus, we review the trial court's denial of a motion for a continuance for an abuse of discretion. *Id.* In reviewing the trial court's findings of fact, we will defer to such findings "so long as [they] are supported by evidence in the record." *Id.* at ¶ 26.

## 3.　Applicable Law

¶ 11　　The Sixth Amendment affords criminal defendants the right to be represented by counsel of their choice. U.S. Const. amend. VI; *see Rodriguez v. Dist. Court*, 719 P.2d 699, 705 (Colo. 1986). This

right is entitled to "great deference." *Rodriguez*, 719 P.2d at 705. Nevertheless, the right is not absolute and must in some cases yield when "fundamental considerations other than a defendant's interest in retaining a particular attorney are deemed of controlling significance." *Id.* at 706.

¶ 12    In *Brown,* the supreme court set forth an eleven-factor test for trial courts to use when analyzing a request for a continuance to substitute defense counsel. Under *Brown,* ¶ 24, a trial court must consider the following:

> 1. the defendant's actions surrounding the request and apparent motive for making the request;
>
> 2. the availability of chosen counsel;
>
> 3. the length of continuance necessary to accommodate chosen counsel;
>
> 4. the potential prejudice of a delay to the prosecution beyond mere inconvenience;
>
> 5. the inconvenience to witnesses;
>
> 6. the age of the case, both in the judicial system and from the date of the offense;
>
> 7. the number of continuances already granted in the case;
>
> 8. the timing of the request to continue;

9. the impact of the continuance on the court's docket;

10. the victim's position, if the victims' rights act applies; and

11. any other case-specific factors necessitating or weighing against further delay.

No one factor is dispositive, "and the weight accorded to each factor will vary depending on the specific facts at issue in the case." *Id.*

¶ 13     Our supreme court has recently made clear that *Brown* does not apply in every case, however. In *People v. Travis,* the court held that, while *Brown* is not limited to its facts, it is inapplicable when "the defendant expresses a general interest in retaining counsel, but has not identified replacement counsel or taken any steps to retain any particular lawyer." 2019 CO 15, ¶ 14. Applying *Brown* in such circumstances would require the trial court to speculate about the availability of unknown counsel and the amount of time unknown counsel would require preparing for trial. *Id.* at ¶ 15. Thus, an analysis pursuant to *Brown* "would require an unrealistic level of speculation by the trial court." *Id.*

## 4.    Application

¶ 14    Contrary to both parties' arguments, we need not determine whether the trial court properly applied *Brown*'s eleven-factor test. Like the defendant in *Travis*, Flynn's interest in retaining alternate counsel was too tenuous to be analyzed by the trial court pursuant to *Brown*. The inapplicability of *Brown* is highlighted by the fact that at least two factors cannot even begin to be considered here: (1) the availability of counsel and (2) the length of a continuance necessary to accommodate counsel. *See Travis*, ¶ 15. Further, until the length of the resulting delay is known, the trial court would be hard-pressed to fully consider other *Brown* factors, such as the potential prejudice to the prosecution and the inconvenience to witnesses.

¶ 15    Although Flynn identified an attorney by name in his requests for a continuance, there was no indication that this attorney was available, or willing, to take Flynn's case.[1] Indeed, Flynn only said he was going to visit the named attorney's office "to see if he can set up the retainer." *Cf. Ronquillo v. People*, 2017 CO 99, ¶ 36 (the

---

[1] We note that this attorney is not the same attorney who had originally represented him before withdrawing early in the case.

7

defendant sought to fire retained counsel and proceed with a public defender, whom he was eligible to retain); *Brown*, ¶ 33 (newly retained counsel had already filed an entry of appearance). Flynn's nascent desire to retain another attorney was, at best, aspirational. Under such uncertain circumstances, applying the *Brown* factors "would require an unrealistic level of speculation by the trial court." *Travis*, ¶ 15.[2]

¶ 16 Because the findings set forth in *Brown* were not required here, we review the trial court's decision to deny the continuance for a "clear abuse of discretion." *Id.* at ¶ 16 (quoting *People v. Crow*, 789 P.2d 1104, 1106 (Colo. 1990)).

¶ 17 In denying Flynn's requests for a continuance, the trial court considered Flynn's incentive to delay trial — particularly in light of his attorney's representations that Flynn had not been in contact with her during her preparations for trial — and the lack of evidence indicating that he had taken any steps at all to retain private counsel. The court also noted that it might have considered

---

[2] Were we to hold otherwise, a defendant could avoid the application of *Travis* merely by mentioning by name any attorney, regardless of whether he or she had taken any steps whatsoever to retain that attorney.

a continuance if private counsel had filed an entry of appearance, or even been present to indicate a conditional intent to represent Flynn.  Because nothing suggests the trial court abused its discretion, we perceive no error.

### B.     Suppression of Material Evidence

¶ 18     Flynn next argues that the trial court erred in determining that no due process violation occurred when the prosecution suppressed exculpatory, material evidence.

### 1.     Additional Facts

¶ 19     At trial, Detective Dean Groff testified as to the efforts he undertook to locate the Cadillac or connect it to Flynn.  Groff testified that for a couple weeks, he "made special efforts daily" to drive by Flynn's house, but never saw the Cadillac in front of the house.  In response to a jury question, Groff also testified that he checked Division of Motor Vehicles (DMV) records and failed to find a Cadillac registered to Flynn's address.  Groff did not document these efforts in any police report, and the information was not provided to the defense before trial.

¶ 20     During the jury instruction conference, defense counsel requested that the trial court "instruct the jury that the prosecution

is under legal duty to disclose all potentially exculpatory evidence, evidence that tends to negate guilt of the defendant, or even just plain helpful information" and submitted a proposed instruction. Defense counsel argued that this instruction should be provided because Groff's investigatory efforts should have been disclosed during discovery pursuant to Crim. P. 16 and would have assisted defense counsel in preparing a defense in this case.

¶ 21     The trial court rejected the instruction but indicated that counsel could argue the point in closing. The court was hesitant to characterize the evidence as exculpatory:

> THE COURT: The issue that I have got, and I reviewed this instruction, the issue I have is the third paragraph where it says Detective Dean Groff was aware he had researched records from the [DMV]. My recollection of the testimony was that he basically took the information obtained by Officer Lawrence who did the – who did the DMV search, and used that in whatever way.
>
> The other concern I have is that I am not sure just how -- whether his failure to put in a report that he drove by his house a couple times once or twice a day looking for this Cadillac, I don't know if that is exculpatory at all or helpful.
>
> I suppose helpful is a subjective word. The defense may consider it helpful. The prosecution may consider it to be non-information. So I am not sure how to

10

categorize that. I don't want to state as a
matter of law something that is ambiguous.

## 2.     Standard of Review

¶ 22     A *Brady* claim presents a mixed question of fact and law.
*People v. Bueno*, 2018 CO 4, ¶ 20. We review the trial court's
factual findings for clear error and its legal conclusions de novo. *Id.*
The standard of reversal for a trial error in resolving an asserted
*Brady* violation is constitutional harmless error. *People v. Mendez*,
2017 COA 129, ¶ 35. "Under this standard, reversal is required
unless we are 'able to declare a belief that [the error] was harmless
beyond a reasonable doubt.'" *Id.* (alteration in original) (citation
omitted).

## 3.     Applicable Law

¶ 23     In addition to their disclosure obligations under the Rules of
Criminal Procedure, prosecutors have a constitutional duty to
disclose to the defense any material, exculpatory evidence they
possess. U.S. Const. amends. V, XIV; Colo. Const. art. 2, § 25;
Crim. P. 16(I)(a)(2); *see also Salazar v. People*, 870 P.2d 1215, 1220
(Colo. 1994). The prosecution's suppression of such evidence

11

violates a defendant's due process rights.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

¶ 24  To establish such a violation, a defendant must show "(1) the prosecution suppressed evidence (2) that is exculpatory or favorable to the defendant and (3) that is material to the case."  *Bueno*, ¶ 29.

¶ 25  In the event of a due process violation, the court should fashion a sanction with the goal of "restor[ing] as nearly as possible the level playing field that existed before the discovery violation." *People v. Dist. Court*, 808 P.2d 831, 837 (Colo. 1991).  To determine the appropriate sanction, the court should consider the reason for the delay in disclosing discoverable information, any prejudice a party suffered because of the delay, and the feasibility of curing any prejudice through a continuance or recess during trial.  *People v. Zadra*, 2013 COA 140, ¶ 16, *aff'd*, 2017 CO 18.

### 4.    Application

¶ 26  The first question is whether evidence was suppressed. Suppression occurs when a prosecutor fails to disclose evidence, regardless of whether the prosecutor acts in bad faith.  *Kyles v. Whitley*, 514 U.S. 419, 432 (1995).  Groff admitted at trial that he failed to report his observations as to Flynn's house and the results

12

of his search of the DMV records. As a result, neither was disclosed to the defense during discovery. Therefore, we conclude the prosecution suppressed this evidence.

¶ 27    We turn now to the second and third prongs: whether the evidence was exculpatory or favorable to the defense, and whether it was material.

### a.    Observations of Flynn's House

¶ 28    As the trial court aptly noted, it is difficult to characterize the value of Groff's observations of Flynn's house. Although Groff testified that he never saw the Cadillac at Flynn's house, he also testified that he did not know what was in the "large, oversized garage" on the property. He explained that these observations were made "in the mornings and then again possibly in the afternoon." However, that the vehicle was not seen during these relatively fleeting moments is of little, if any, import. Because we agree with the trial court that the value of this evidence is unclear, we perceive no error in its decision to not treat its suppression as a *Brady* violation.

### b. DMV Search

¶ 29    The DMV search presents a closer question.  Although the trial court characterized this evidence as simply following up on the investigation of another officer, this is not dispositive of our analysis.  Exculpatory evidence "tends to mitigate the likelihood of guilt or the severity of the sentence."  *Bueno*, ¶ 31.  The DMV search was unable to connect the Cadillac identified by Garibay to Flynn or his residence.  Thus, evidence of this DMV search was exculpatory because it mitigated, albeit only slightly, the likelihood that Flynn was the driver of the Cadillac.

¶ 30    The inquiry must then turn to whether the evidence was material.  In the *Brady* context, evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *Id.* at ¶ 32 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

¶ 31    However, unlike most other *Brady* cases of which we are aware — in which the jury never heard about the suppressed evidence because the suppression was not unearthed until after

trial — the jury here heard testimony about the DMV search at trial and defense counsel was able to cross-examine Groff about this evidence. Because the jury heard the suppressed evidence and returned a guilty verdict, we must conclude that the suppressed evidence itself was not material.

¶ 32 Flynn nevertheless maintains that defense counsel could have exploited this evidence had she received advance notice, and her lost opportunity to do so undermines confidence in the outcome. We are not persuaded.

¶ 33 Specifically, Flynn argues that counsel was unable to present documentation from the DMV to substantiate the lack of connection between Flynn and the Cadillac or the viability of Groff's DMV search. But the prosecution did not attempt to undermine the validity of Groff's testimony that the DMV search failed to find a Cadillac registered to Flynn's address.[3] Thus, we conclude there is

---

[3] Similarly, Flynn argues that he could have called witnesses to establish that the Cadillac was not in his garage. While this argument is directed more to the evidence of the failed surveillance efforts, which we have concluded was neither exculpatory nor favorable to the defense, we note that, because the prosecution never disputed the fact that it could not tie the Cadillac to Flynn or his address, the surveillance evidence was not material either.

no reasonable possibility that the suppression of the DMV search until trial "might have contributed to the conviction." *Mendez*, ¶ 45 (quoting *Hagos v. People*, 2012 CO 63, ¶ 11).

### C.    The Trial Court's Comments During Voir Dire

¶ 34    Flynn lastly argues that the trial court erred in making comments during voir dire that lowered the prosecution's burden of proof. We disagree.

### 1.    Additional Facts

¶ 35    The trial court conducted "a lengthy voir dire, which it informed the jury would 'deal[] with all of the fundamental principles of criminal cases and jury service." As relevant here, the trial court used a number of hypotheticals and examples to explain several legal concepts to the jury.

¶ 36    The court first used a hypothetical to explain the prosecution's burden of proof. The court hypothetically accused a juror of stealing an iPod, then explained that if charges were brought against the juror, he would be presumed innocent "until the prosecution's evidence proves that he is guilty beyond a reasonable doubt." The court then read the standard definition of presumption of innocence to the jury.

¶ 37    The court then used hypotheticals to explain reasonable doubt

to the jury.  The court distinguished reasonable doubt from any

doubt by questioning the stability of the courthouse and the validity

of a juror's birth certificate:

> THE COURT:  . . . I can probably raise some
> doubt about whether this building's going to
> stand for another 24 hours by talking about
> the cracks that I see in the foundation and
> everything.  Would you all go running out?
> No.  Okay?  But, you know, that's a vague
> doubt.
>
> . . . .
>
> THE COURT:  You know, I can create some
> kind of vague, imaginary doubt about
> anything, you know.  Well, maybe the hospital
> was wrong, and maybe your mom got the date
> wrong.
>
> THE PROSPECTIVE JUROR:  Sure.
>
> THE COURT:  But I guarantee you this March
> 17 you are going to recognize that as your
> birthday, aren't you?
>
> THE PROSPECTIVE JUROR:  I am.
>
> THE COURT:  Because I haven't convinced you
> beyond a reasonable doubt.

The court then applied the concept of reasonable doubt to criminal

cases.

17

¶ 38    The trial court also compared the prosecution's burden of

proof to "beyond a shadow of a doubt," a higher burden popularized

by a television show:

> THE COURT:  . . . [Perry Mason] was a very
> imposing man played by Raymond Burr.  He
> was in the courtroom, a defense attorney, and
> he would always, at the close of evidence in the
> trial, he would approach the jury and say,
> ladies and gentlemen of the jury, the
> prosecutor has failed to prove this case beyond
> a shadow of a doubt.  Oh, did that sound good.
> Okay?  There is no such thing, okay?  Not in
> any -- not in civil law, not in criminal law.  We
> don't have proof beyond a shadow of a doubt,
> okay?
>        Again, going back, it's proof beyond a
> reasonable doubt, and that is the -- one of the
> highest burdens of proof in American
> jurisprudence, okay?  It's proof beyond a
> reasonable doubt.

Defense counsel did not object.

## 2.    Standard of Review

¶ 39    We review de novo whether the trial court properly instructed

the jury on the burden of proof.  *People v. Robles*, 302 P.3d 269,

280 (Colo. App. 2011), *aff'd*, 2013 CO 24.  In most cases, we review

unpreserved issues for plain error.  *People v. Baca*, 2015 COA 153,

¶ 12.  Thus, reversal is warranted "only if the error was obvious and

'so undermined the fundamental fairness of the trial itself so as to

18

cast serious doubt on the reliability of the judgment of conviction.'" *Id.* (citations omitted). However, "[a]n instruction that lowers the prosecution's burden of proof below reasonable doubt constitutes structural error and requires automatic reversal." *Johnson v. People*, 2019 CO 17, ¶ 8 (citing *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993)).

### 3.    Law and Application

¶ 40    "To be valid, a reasonable doubt instruction must instruct the jury that it may return a guilty verdict only if sufficient proof has been submitted to satisfy the standard." *People v. Munoz*, 240 P.3d 311, 316 (Colo. App. 2009). The instruction must "apprise[] the jury of the necessity that the defendant's guilt be proved beyond a reasonable doubt, and no particular form is required." *Id.*

¶ 41    Trial courts are instructed to explain to prospective jurors "in plain and clear language . . . [g]eneral legal principles applicable to the case including the presumption of innocence, burden of proof, definition of reasonable doubt, elements of charged offenses and other matters that jurors will be required to consider and apply in deciding the issues." Crim. P. 24(a)(2)(v). To that end, the model jury instructions provide introductory comments to be read to the

jury, which explain the standard definitions of these basic principles. COLJI-Crim. B:01 (2018).

¶ 42 Well-intentioned trial courts, seeking to provide additional clarity to prospective jurors, sometimes feel the urge to go beyond these instructions and either insert their own supplemental instructions or attempt to add "flesh to the bones" of the standard instructions by providing examples and hypotheticals. Divisions of this court have repeatedly expressed disapproval of the practice, because such instructions run the risk of confusing the jurors and may even lower the burden of proof or diminish the presumption of innocence. *See, e.g.*, *People v. Boyd*, 2015 COA 109, *aff'd*, 2017 CO 2; *People v. Estes*, 2012 COA 41; *People v. Gomez-Garcia*, 224 P.3d 1019 (Colo. App. 2009); *People v. Sherman*, 45 P.3d 774 (Colo. App. 2001).

¶ 43 Our supreme court has recently added its voice to this cautionary chorus: "[F]urther attempts by courts or parties to define 'reasonable doubt' do not provide clarity." *Johnson*, ¶ 13 (citing *Holland v. United States*, 348 U.S. 121, 140 (1954)). In *Johnson*, the trial court had attempted to explain "hesitate to act" in the context of "reasonable doubt." *Id.* at ¶ 4. The trial court explained

20

that engaging in deliberations was not the same as hesitating to act, but that hesitating meant: "You just have to hesitate. It's not there. You can't find her guilty because the quality or quantity of evidence just doesn't let you." *Id.* at ¶ 17. The supreme court characterized the instruction as "indecipherable" and "unintelligible." *Id.* However, it concluded that the instruction, albeit confusing, "did not lower the prosecution's burden in violation of due process." *Id.* at ¶ 18. [4]

¶ 44 Indeed, particularly because an inarticulate attempt to do so — if it takes the form of an instruction[5] — may result in automatic reversal, deviating from or expounding on the standard instructions in this area is undeniably risky, in that it exposes the conviction to a challenge that the comments lowered the burden of proof.

---

[4] In a further peal of the cautionary bell, though our supreme court found some of the instruction "logical and not legally infirm," it nevertheless disapproved of the entire instruction. *Johnson v. People*, 2019 CO 17, ¶ 17 & n.2.

[5] We do not believe that every comment made by a trial court to the jury panel during voir dire is automatically an instruction. *See People v. Boyd*, 2015 COA 109, ¶ 12 (opining that the court's comments during voir dire discussions were not an instruction), *aff'd*, 2017 CO 2. *But see People v. Carter*, 2015 COA 24M-2, ¶ 54 (characterizing the trial court's use in voir dire of a puzzle analogy as an "instruction on the beyond a reasonable doubt standard").

21

¶ 45    Flynn argues precisely that.  In particular, he identifies both published and unpublished cases from this court that repeatedly disapprove of certain comments made by the same trial court judge during voir dire in other cases.  *See People v. Ramos*, 2012 COA 191; *Estes*, 2012 COA 41.[6]  The comments in those cases "risked inviting the jurors to assume that defendant had a bad character or to discard the possibility that he may have been arrested and charged through mistake or inadvertence."  *Estes*, ¶ 11.

¶ 46    But the comments made here were analogous to those in *Estes* and *Ramos* only in the sense that they involved extended efforts to supplement the standard jury instructions.  Unlike the comments in those cases, the trial court's discussion in this case did not suggest to the jury that Flynn "did something" that resulted in him being charged, nor did they "improperly align[] the court with the prosecution."  *Estes*, ¶ 10.  Nor did the comments suggest that the

---

[6] The People object to Flynn's "citation" to unpublished opinions.  However, the unpublished opinions were cited in one of the published opinions on which Flynn relies, *People v. Estes*, 2012 COA 41, ¶ 8.  Flynn does not discuss the details of any of the unpublished cases and does not argue that any of them should be given precedential weight.  Thus, we discern no violation of this court's policy prohibiting citation to unpublished cases.

prosecution's evidence appeared to be "too good to be true." *Ramos*, ¶ 43. We decline to find error merely because the same judicial officer erred in the past.

¶ 47    Flynn's reliance on *Sherman* is also misplaced. There, the trial court gave an instruction that essentially redefined reasonable doubt, stating that it was "a doubt for which you could give a reason. It's a rational, objective statement of why you feel that something hasn't been proven, or why you have a doubt." 45 P.3d at 777. This instruction was fundamentally inconsistent with the beyond a reasonable doubt instruction because there is no support for the suggestion that a juror must be able to articulate why he or she has a doubt. Here, in contrast, the trial court did not add any requirements to the definition of reasonable doubt.

¶ 48    Flynn's reliance on *Jones v. State*, 656 So. 2d 489 (Fla. Dist. Ct. App. 1995), is equally unavailing. There, the Fourth District Court of Appeal of Florida found error where the trial court told jurors they did not have to have "an absolute certainty of the Defendant's guilt," but did not otherwise give a proper definition of reasonable doubt. *Id.* at 490-91. Here, the trial court repeatedly referred the jury to the standard definition of reasonable doubt.

23

¶ 49   In contrast to the cases relied upon by Flynn, we find the analysis in *Johnson* to be more helpful.  As in that case, each of the hypotheticals here was discussed verbally, and only once.  None was mentioned again at any time during the proceedings.  The trial court read the correct definitions of beyond a reasonable doubt and presumption of innocence contemporaneously with the discussions.  Indeed, the trial court repeatedly referred back to the appropriate standard definition of reasonable doubt.  And at the conclusion of trial, the correct instructions were again read to the jury.  Thus, we conclude the comments did not lower the burden of proof.

## III.   Conclusion

¶ 50   The judgment is affirmed.

JUDGE RICHMAN and JUDGE ROTHENBERG concur.